John Rossi v. Commissioner. Estate of Myrtle Rossi, Deceased, Bank of America National Trust and Savings Association, Executor v. Commissioner.
Rossi v. Commissioner
Docket Nos. 22206, 22207.
United States Tax Court
1950 Tax Ct. Memo LEXIS 98; 9 T.C.M. (CCH) 778; T.C.M. (RIA) 50217; September 18, 1950
Oliver M. Jamison, Esq., 1001 Helm Bldg., Fresno, Calif., and T. Newton Russell, Esq., for the petitioners. Robert H. Kinderman, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in the income tax liability of the petitioners for the year 1943 as follows: Docket No. 22206
$6,601.03
Docket No. 22207
6,601.04
These proceedings have been consolidated for trial and opinion. The issue in these proceedings is whether or not John and Myrtle Rossi constructively received income in 1942 from the sale of their crop of figs to a canning company and from the hauling of fruit which was done for the canning company. The respondent has determined that the income in dispute was not constructively received in 1942 and is *99 properly includible in the petitioners' income for 1943. The petitioners filed their returns with the collector for the first district of California. The record in these proceedings consists of a short stipulation of facts, oral testimony, and various exhibits. Findings of Fact The facts which have been stipulated are hereby found as facts. During the years 1942 and 1943 John Rossi and Myrtle Rossi were husband and wife residing at Planada, California. All of the income received by either John or Myrtle Rossi during 1942 and 1943 was community property of the type acquired in California during marriage and after July 29, 1927. During 1942 and 1943 they kept their books and filed their returns on the cash receipts and cash disbursements basis of accounting. Myrtle Rossi has since died, and the Bank of America National Trust and Savings Association is the duly qualified executor of her estate. For convenience, John Rossi will hereinafter be referred to as the petitioner in these proceedings. Since 1927 petitioner has been a farmer engaged in growing fruit in the vicinity of Planada, California. In 1936 petitioner entered into a five-year contract with the Filice and Perrelli *100 Canning Company (hereinafter referred to as "F. & P."). This contract provided that petitioner would sell to F. & P. Kadota figs which were grown in his orchard. F. & P. agreed to pay for the figs delivered by either paying to petitioner the market price at the time of delivery, or at petitioner's option paying him the market price adjusted for the profit realized or loss sustained by F. & P. upon the subsequent resale of the figs when such resale took place. From 1936 to 1940 petitioner elected to receive payment for the figs which he delivered to F. & P. under the profit-sharing option. Final settlement was not made by F. & P. under the contract in these years until the year following delivery of the fruit because the exact amount due petitioner could not be ascertained until the entire crop had been sold in the following year. In the years prior to 1940 the market for canned fruit was not stable, and there was no way of foretelling the price at which the canned fruit could be sold at the time of petitioner's delivery to F. & P. In 1940 the market for canned fruit began to stabilize. In the fall of 1940 petitioner entered into a new agreement with F. & P. providing for deliveries *101 of figs for the years 1941 through 1945. This agreement was similar to that entered into between the parties in 1936. It gave petitioner two options for receiving payment for his crop. The first option was a profit-sharing arrangement under which petitioner's account on F. & P.'s books would be credited with the market price of the figs. This credit was subject to an adjustment based on F. & P.'s profit or loss from the subsequent resale of the figs after canning. The second option gave petitioner an election to receive the market price for his crop without any adjustment for F. & P.'s profit or loss, as follows: "ELECTION TO TAKE MARKET PRICE WITHOUT PROFIT SHARING. In lieu of the terms, adjusted price and payments, hereinotherwise provided, the Grower may elect to receive the Market Price in full payment for all or any part of any season's crop, payable as follows: fifty percent of the Market Price for each week's deliveries payable on demand, on or after the Thursday of the week following such deliveries, twenty-five percent in thirty days after the final delivery for such season and twenty-five percent in sixty days after the final delivery for such season. Notice of the Grower's *102 election, under this paragraph, shall be given in writing prior to the first delivery for such season." Petitioner elected to sell his fig crop to F. & P. in 1941 under the profit-sharing option. At the end of 1941, petitioner had a credit balance with F. & P. in the amount of $12,833.36. This balance was paid to petitioner on May 8, 1942. Some time before he made arrangements to sell his 1942 crop of figs to F. & P., petitioner became dissatisfied with the profitsharing arrangement. He elected to exercise his option to receive the market price for his crop without any adjustment for F. & P.'s profit or loss. F. & P. agreed to pay petitioner the market price for his fig crop promptly after its delivery to F. & P. Prior to the harvest in 1942, F. & P. advised petitioner that the price which it would pay for his 1942 crop of figs would be $90 per ton for No. 1 grade figs and $60 per ton for No. 2 and No. 3 grade figs. This was the market price in 1942 which had been set by the canners pursuant to the regulations of the Office of Price Administration. In 1942 petitioner delivered to F. & P. 1,702,253 pounds of No. 1 grade figs, 434,580 pounds of No. 2 grade figs, 179,967 pounds *103 of No. 3 grade figs, and 166,460 pounds of cull figs. Delivery of the 1942 crop of figs by petitioner was completed on November 12, 1942. On November 21, 1942, F. & P. entered a credit to the account of petitioner in its growers' ledger in the amount of $94,992.89, which was the amount due petitioner for the figs delivered by him in 1942. Prior to the entry of this credit in the ledger account, F. & P. had made advances of $64,828.68 to petitioner, leaving a credit balance in his account on November 21, 1942, which totaled $30,164.21. The title of petitioner's account was changed from a profit-sharing account to a regular account at this time in order to conform with the agreement between the parties. However, the bookkeeper, by mistake, stamped a standard notation on the bottom of petitioner's account to the effect that the credits were made for computation purposes only and that final payment would be adjusted according to the profit-sharing arrangement. In the latter part of November or early part of December, 1942, petitioner discussed payment for his crop with F. & P. F. & P. offered to pay immediately the balance due petitioner. F. & P. suggested, however, that it would be *104 a favor to the company if petitioner did not take his money until 1943, and the company recommended that petitioner leave the amount due him with the company where it would be safe and could be drawn on by petitioner as he needed it for pruning, spraying, income taxes, and other expenses. Petitioner agreed to this and made no demand for payment in 1942. F. & P. did not pay any interest to petitioner on the balance owing to him at the end of 1942 until payment was finally made in 1943. During 1943 petitioner sold his fig crop to F. & P. under the same contract as he made sales to F. & P. in 1942. Again, petitioner elected to exercise his option to receive the market price for his fig crop without any adjustment for F. & P.'s profits or losses. By November 8, 1943, F. & P. had paid to petitioner $170,121.13, which represented the full purchase price for all the fruit sold by petitioner to F. & P. during that year. The $170,121.13 which petitioner received for his 1943 fig crop from F. & P. represented payment made at the current market prices promptly upon delivery. There was no substantial limitation or restriction as to the time or manner of payment or condition upon which payment *105 was to be made of the $30,164.21 balance due petitioner from the sale of his fig crop to F. & P. in 1942, and this amount was definitely ascertained and unqualifiedly made subject to his demand prior to the end of that year. Petitioner hauled fruit for F. & P. in 1942 under an agreement which provided that he was to be paid promptly at the regular commercial rate. On December 8, F. & P. entered a credit in petitioner's account in the amount of $1,069.86 as the amount due him for the hauling of fruit. Although petitioner decided to leave the money with the company, there was no substantial restriction or limitation upon its payment prior to the end of 1942, and the amount was unqualifiedly subject to his demand prior to the end of that year. On February 28, 1943, F. & P. reduced petitioner's credit balance by $22.47. During 1943 F. & P. made payments on the balance of $31,211.60 which it owed to petitioner for his 1942 crop and for the hauling which he did in 1942 as follows: April 9, 1943
$ 300.00
April 23
10,000.00
May 4
5,000.00
May 18
7,500.00
August 13
8,411.60
Total
$31,211.60
F. & P. customarily borrowed money to finance the canning of each season's *106 fruit crop. During the years 1942 and 1943, F. & P. borrowed money from the Capital National Bank of Sacramento. As security F. & P. gave to the bank non-negotiable warehouse receipts covering canned goods. The loans were usually 65 per cent of the market price of the fruit. As F. & P. sold its inventory, it made payments to the bank on the loans. As the sales were made by F. & P., the bank released the warehouse receipts to the buyer. During the years 1942 and 1943 the market for canned figs was very good, and F. & P. was able to sell all the fruit it was able to can. During those years the armed forces purchased a substantial portion of the fruit which was canned, and there was a shortage of the fruit for civilian consumption. On December 31, 1942, F. & P. had cash in the bank of $164,195.02. It owed to the bank the sum of $370,892.13, which was secured by non-negotiable warehouse receipts on F. & P.'s inventories of canned goods. F. & P. had an unsecured line of credit with the bank of at least $35,000. The company was solvent, and it was financially able to and did meet its obligations as they matured. Prior to the end of 1942, it was financially able to pay to petitioner the *107 $30,164.21 due him for his fig crop and the $1,069.86 which he earned by the hauling of fruit. Petitioner constructively received the balance of $30,164.21 due him for the sale of his crop of figs to F. & P. and the $1,069.86 which he earned by the hauling of fruit for the canning company during 1942. Opinion The issue in these proceedings is whether or not petitioner constructively received income from the sale of figs to a canning company and from the hauling of fruit for that company during the year 1942. If the income was constructively received in 1942, as petitioner contends, it was properly includible in his income for that year. If it was not constructively received in that year, as respondent contends, then it is properly includible in petitioner's income for 1943, the year of its actual receipt. Admittedly, petitioner, who was on the cash basis, did not actually receive during 1942 either the $30,164.21 from the sale of his fig crop to F. & P. or the $1,069.86 in payment for the hauling which he did for F. & P. However, a taxpayer who reports his income on the cash basis must include income "constructively received" during the taxable year as well as income actually *108 reduced to his possession. ; (promulgated August 31, 1950); Regulations 111, section 29.42-2. Under Regulations 111, section 29.42-2, income is constructively received if it is "credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made," and if it is "made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition." Income from the sale of figs to F. & P. In dispute is $30,164.21 which petitioner contends he constructively received from the sale of figs to F. & P. during 1942. He argues that the amount due him under his contract with F. & P. was ascertained prior to the end of 1942 and that it was subject to his unqualified demand and control prior to the end of that year. Respondent, on the other hand, contends that the income petitioner earned through the sale of his fig crop to F. & P. was not constructively received during 1942 because it was neither finally ascertained nor subject to his unqualified demand during that *109 year. He bases this contention primarily on the argument that the contract under which petitioner sold his figs to F. & P. was a profit-sharing contract under which the final amount due petitioner was not ascertained until 1943. The evidence clearly shows, however, that during 1942 petitioner sold his fig crop to F. & P. under an agreement which provided that petitioner would be paid the market price for the figs promptly after their delivery, rather than under a profit-sharing agreement. Both petitioner and the officer of F. & P. with whom he dealt testified that petitioner had become dissatisfied with the profit-sharing arrangement and that F. & P. agreed to pay him the market price for his fig crop promptly after its delivery to F. & P. The prices per ton and grade of figs were set pursuant to this agreement before the harvest in 1942. Upon the delivery of the figs in the autumn of 1942, the agreed prices were credited to petitioner's account. No changes were ever made in this credit either for profits earned or losses sustained by F. & P. upon the subsequent resale of the figs after their canning, and the amount which F. & P. paid to petitioner for his fig crop was the amount *110 which had been so credited to his account. There was no profitsharing arrangement between petitioner and F. & P. in connection with the 1942 fig crop, and the amount due petitioner was ascertained on F. & P.'s books prior to the end of 1942. The $30,164.21 in question was unqualifiedly made subject to petitioner's demand in 1942. The evidence is uncontroverted that in late November or early December of 1942 F. & P. offered to pay to petitioner immediately the amount which was due him for his figs. The fact that petitioner decided not to accept the benefits of this offer is of no consequence. The principle of constructive receipt is designed to prevent the exclusion from taxable income of items the actual receipt of which, at the taxpayer's option, can be deferred or postponed indefinitely. A cash basis taxpayer cannot elect the year in which he desires to have items included in his income by refusing to accept amounts which are unqualifiedly made subject to his demand. [Dec. 8240]; ; see, also, Mertens, Law of Federal Income Taxation, section 10.01. The doctrine of constructive *111 receipt is available to the taxpayer, as well as to the Government, where the taxpayer is resisting the inclusion in his income for one year amounts which he constructively received in another year. ; ; . Respondent also argues that the petitioner could not have constructively received the amount in dispute in 1942 because F. & P. was financially unable to make payment to him prior to the end of that year. Respondent appears to disregard the fact that F. & P. actually offered to make payment to petitioner during 1942 and relies on the argument that F. & P. did not have a cash balance sufficient to liquidate all its loans and obligations at one time. These obligations, however, were not all due at the end of 1942, and the bank loans were secured by F. & P.s inventory of fruits which it had canned. Moreover, it is the exceptional business which will pursue so uneconomic a policy as to maintain constantly on hand, or in the bank, sufficient cash to liquidate all its outstanding obligations, whether or not they are due. In view of its offer *112 of payment, there is little question that F. & P. was financially able to pay petitioner in 1942. The company was solvent; it had cash balances several times the amount of the obligation due petitioner; it had an unsecured line of credit of at least $35,000; and its hypothecated inventory had a readily realizable value nearly $180,000 in excess of the loan balance which was secured by the inventory. It is held that the balance of $30,164.21 due petitioner from the sale of his crop of figs was constructively received by him in 1942 and is properly includible in his income for that year. Income from the hauling of fruit for F. & P. During 1942 petitioner hauled fruit for F. & P. under an agreement whereby he was to be paid promptly at the regular commercial rate. On December 8, 1942, F. & P. credited petitioner's account with $1,069.86, which he had earned by hauling fruit for the company. At the trial and in his brief, respondent made no distinction between the $1,069.86 which petitioner so earned and the $30,164.21 which he earned from the sale of fruit to F. & P. Respondent's primary argument as to the nature of the contract under which petitioner sold his figs to F. & P. does *113 not apply to the income earned by petitioner through hauling since the hauling agreement resulted from a separate, independent transaction. What was said earlier about F. & P.'s ability to pay the $30,164.21 is equally applicable to the $1,069.86. In addition, the evidence is uncontroverted that there was no substantial restriction or limitation upon the payment of this sum by F. & P. prior to the end of 1942, and the amount was unqualifiedly subject to petitioner's demand prior to the end of that year. It is held that the $1,069.86 which petitioner earned by the hauling of fruit was constructively received by him in 1942 and is properly includible in his income for that year. Decisions will be entered under Rule 50.